UNITED STATES of America,

v.

NOVA SCOTIA FOOD PRODUCTS
CORP., et al., Defendants,

and

National Fisheries Institute, Intervenor.

No. 76 C 647.

United States District Court,
E. D. New York.

Aug. 17, 1976.

David W. McMorrow, New York City (David G. Trager, U. S. Atty., Brooklyn, N.Y., Richard A. Merrill, Chief Counsel, Forrest T. Patterson, Rockville, Md., Assoc. Chief Counsel, and Arnold I. Friede, Asst. Chief Counsel, U. S. Food and Drug Administration, Washington, D.C., of counsel) for the Government.

Joseph H. Einstein, New York City and Richard S. Morey, Washington, D.C. (Aranow, Brodsky, Bohlinger, Benetar & Einhorn, New York City and Kleinfeld, Kaplan & Becker, Washington D.C., of counsel) for defendants and for intervenor.

## MEMORANDUM INCORPORATING FINDINGS of FACT and ORDER

DOOLING, District Judge.

The action was commenced on April 7, 1976, in substance to compel the defendants to comply with the Current Good Manufacturing Practice (sanitation) regulations (21 C.F.R. §§ 128(a).1 to 128(a).7) by preliminarily and permanently enjoining defendants from processing hot smoked fish unless and until their manufacturing practices are brought into conformity with the Current Good Manufacturing Practice (Sanitation) regulations

Defendants are engaged in Brooklyn in the business of receiving in interstate commerce frozen or iced white fish which are processed by defendants, that is, they are brined, smoked and cooked. The white fish are then held for distribution and distributed to stores as smoked white fish. The Food and Drug Administration inspectors made inspections of defendants' plant in July 1975 and again in February 1976, and on each occasion they found that defendants were not processing the smoked white fish in accordance with the regulations, primarily in that the process did not meet the heat and brining requirements of 21 C.F.R. § 128a.7(c)(4), (d)(2). Specifically the regulations required oven "cooking" the white fish at 180°F. for 30 minutes if the salinity of the fish was at 3.5% or at 150°F. for 30 minutes if the salinity was at 5%. There is no real dispute as to the facts of defendant's practice. The defendant did not heat the fish at 180°F. for a half hour nor did the salinity of the fish reach the 3.5% level.

The applicable portion of the regulation not complied with reads as follows:

"(c) *Presmoking Operation.*

\*  \*  \*  \*  \*  \*

"(4) Hot-process smoked or hot-process smoke-flavored fish shall be brined in such a manner that the final salt (sodium chloride) content of the loin muscle of the finished product, expressed as percent in the water phase of the loin muscle, shall not be less than:

"(i) 3.5 percent if heat-processed as prescribed under paragraph (d)(2)(i) of this section; or

"(ii) 5.0 percent if heat-processed as prescribed under paragraph (d)(2)(ii) of this section.

\*  \*  \*  \*  \*  \*

"(d) *Heating, cooking, smoking operation.*

\*  \*  \*  \*  \*  \*

"(2) Hot-process smoked or hot-process smoke-flavored fish shall be heated by a controlled heat process that provides a monitoring system positioned in as many strategic locations in the oven as necessary to assure a continuous temperature throughout each fish of:

"(i) Not less than 180°F. for a minimum of 30 minutes for hot-process smoked or hot-process smoke-flavored fish which have been brined to contain 3.5

percent water phase salt in the finished product as prescribed in paragraph (c)(4)(i) of this section, . . . , or

"(ii) not less than 150°F. for a minimum of 30 minutes for hot-process smoked or hot-process smoke-flavored fish which have been brined to contain 5.0% water phase salt in the finished product as prescribed in paragraph (c)(4)(ii) of this section."

The Current Good Manufacturing Practice (sanitation) regulations, dated November 2, 1970 and filed on November 12, 1970 for publication in the Federal Register of November 13, 1970 are not limited to salinity and temperature requirements. They include regulations with respect to unloading platform material and drainage; the provision of separate rooms for receiving and shipping, storing fish, pre-smoking operations including thawing, dressing and brining, and drying and smoking; the processes of packing and storage of the final product were to be carried out in separate rooms or facilities. There is a general requirement that the product be so processed as to prevent contamination by exposure to areas involved in earlier processing steps, to refuse, or to other objectionable areas. The regulations include equipment and utensil requirements with reference particularly to their being made of readily cleanable materials if they come into contact with the food products. The regulations require that adequate hand washing and sanitizing facilities be located in the processing room or rooms or in an area easily accessible from them; signs are to be provided directing employees to wash and sanitize their hands after each absence from their duty posts. There is provision for periodical removal of offal, and requiring that offal, debris, or refuse must not be accumulated in or about the plant. Each day the utensils and product-contact surfaces of equipment must be rinsed and sanitized, and fish containers are not to be nested or handled during processing in a manner conducive to contamination. The cleaning and sanitizing of utensils and equipment are to be so carried out so as not to lead to contamination of the product.

Fish are to be adequately inspected and only clean, wholesome fish are to be processed. Time and temperature controls are established with respect to refrigerating, thawing, spraying and washing fish. Fish are to be completely eviscerated with the minimum disturbance of intestinal tract and thoroughly washed by a continuous spray system. The fish are to be brined in a solution that does not exceed 38°F. and the finished product is required to be cooled to 50°F. within 3 hours of cooking and to 38°F. or less within 12 hours after cooking. The finished product is to be handled only with clean, sanitized hands, gloves or utensils. Shipping containers are to indicate the perishable nature of the product and to specify that the fish must be shipped, stored and held for sale at 38°F. or less until consumed. The product is required to be coded so that each lot's processing history can be traced. Other sections of the regulations require indicating thermometers on freezer and cold storage elements and require a point-sensitive, continuous temperature-recording device to monitor both the internal temperature of the fish and the ambient temperature inside the processing oven, each recording device record to be identified as to specific oven load and date processed.

The regulations thus closely supervise the handling of the fish not only by covering the processing procedures but also by setting requirements for equipment, general procedures and plant cleanliness.

The inspections of July 1975 and February 1976 not only demonstrated failure to comply with the time and temperature and brining exactions of the regulations, but also revealed a failure to maintain the pre-smoking brining stage at the requisite low temperature and failure to achieve the requisite post-smoking and cooking temperature levels. The inspections at the defendant's plant disclosed further that it did not have all of the required indicating thermometers and temperature recording devices.

As already indicated, there is no claim of compliance with the regulations. The de-

fendants have not in any substantial way contested the findings of the FDA inspectors and, indeed, have joined in a stipulation with respect to the findings on deviation from the salinity requirement of the regulations. On the contrary, defendants insist that the time-temperature-salinity standards of the regulations cannot be met without rendering the product unmarketable. The defense, then, has taken the form of an all-out attack on the validity of the regulations involved.

The attack centers on the unquestioned fact that only 21 U.S.C. § 342(a)(4) can be looked to as the source of the Food and Drug Commissioner's authority to adopt the regulations. Defendants claim that it does not authorize any such regulation. It provides in seeming simplicity that

"A food shall be deemed to be adulterated—

"(a) . . . (4) if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health."

The contention takes a second form as an argument that in any event it would not suffice to show a violation of the regulation since the regulation is merely interpretive and not implementive of the law and, in consequence, the government must show that defendants violated the statute, reading the statute directly upon the facts; defendants say that no such showing of statutory violation has been made or attempted, for the Government has made no attempt to show any insanitary conditions at the plant if the word "insanitary" is read in its ordinary sense, the sense invited by its use in the same context with the words "contaminated" and "filth."

It is next argued that the nature and professed object of the regulations was to minimize the hazard to the public of Type E botulism and the risks of food borne infections in the consumption of smoked fish. It is argued that the regulations were put forward as the safest known processing parameters for preventing, through thermal destruction of spores of the bacteria, the outgrowth and toxin formation of Clostridium botulinum Type E. See Proposal of Part 128a for 21 C.F.R., 34 F.R. 17176 (October 16, 1969). It is argued that C. botulinum type Type E is not a contaminant that reaches the fish during processing but is undeniably taken up by the fish from the lake waters which are their natural habitat, and that the known material has long since made it perfectly clear that the risk visualized is remote and unreal in the case of smoked white fish. Defendants argue that to the extent this problem has been associated with smoked white fish, it has been associated with vacuum packaged white fish. That is a mode of packing not followed by the defendants and which apparently is no longer employed in the industry at all.

The final phase of the attack rests on the argument that the regulation is unsupported by the record which it is entitled to call to its support. That record, it is argued, consists only of those materials submitted to the Commissioner by the industry and other interested parties in the course of the rule-making procedure and the materials brought forward and disclosed to the interested parties as being other materials consulted by the Commissioner in arriving at the regulations, to the extent that he did not rely solely on materials submitted in response to the notice of rule-making.

1. There is no doubt that the Current Good Manufacturing Practice (sanitation) regulations, as they are frankly styled in 21 C.F.R. § 128(a).2, are adopted under 21 U.S.C. § 342(a)(4), and that the Commissioner (as the delegate of the Secretary of Health, Education and Welfare, 21 C.F.R. § 2.120(a)(1), (15) ) derived his rule-making authority in this relation solely from 21 U.S.C. § 371(a) which provides simply that

"The authority to promulgate regulations for the efficient enforcement of this chapter, except as otherwise provided in this section, is vested in the Secretary."

Since the evidence is clear that the occurrence of C. botulinum Type E in white fish is not in fact or in the perspective of the

statute a consequence of contaminations caused by unclean manufacturing practices or conditions, defendants' central argument is that the part of the Current Good Manufacturing Practice (sanitation) regulations here involved is, since oriented wholly to the sterilization of C. botulinum Type E occurring naturally in the fish and ingested in their native, water habitat, wholly unauthorized by the statute, and a nullity.

As defendants point out, Section 342(a)(4) has not the specificity found in Section 344(a) dealing with the issuance, in emergencies, of temporary permits. These permits impose conditions governing the manufacturing process. They are issued when, in any locality, contamination with microorganisms is found to be occurring in the processing of any class of foods. And it could be said too that subdivision (4) does not use any of the general language used in other subdivisions of Section 342(a) which deal with substances in, the condition of, the source of, or the packaging of food: it does not use words like "poisonous," or "deleterious," or "putrid," or "decomposed," or "diseased," or "unfit for food." However it evinces a manifest and dominant purpose to deal with the cases in which the food has been prepared, packed or held under conditions whereby it *may have* become contaminated with filth or *may have* been rendered injurious to health. Describing the manufacturing condition as "insanitary" is secondary: the word is given operative content only by reference to the purpose of subsection (a)(4), that is, to provide against whatever condition of processing may render the product injurious to health or contaminate it with filth.

Only subdivision (4) of Section 342(a) treats a food as adulterated whether or not the food has in fact been contaminated or rendered injurious to health. Food is considered adulterated if it has been prepared, packed or held under conditions that *may have* resulted in its contamination or in its becoming injurious to health. It is the only one of the subdivisions which directly deals with processing rather than with product in defining the circumstances in which the food product will be considered adulterated. For purposes of subdivision (4), it is irrelevant that, by any other tests, the food could not have been determined to have been adulterated and could not have been condemned. While Section 342(a)(4) may literally seem to deal only with conditions brought about by processing itself, the regulation under review, Part 128a, is specifically addressed to setting processing parameters to prevent the "outgrowth and toxin formation of C. botulinum Type E." Seen in the perspective of Part 128a's purpose and the purpose of subsection (a)(4), the use of the word "insanitary" in subdivision (4) of Section 342(a) is, at worst, inelegant, but it is not inadequate to include preparing, packing or holding conditions which permit a continuance of the outgrowth and toxin formation of the C. botulinum Type E in the product under process. Because such procedures may render the smoked fish injurious to health, the regulations proscribe cooking the fish at too low a temperature and/or for an insufficient length of time with inadequate salination. The approach of the regulations is that the temperature-time-salinity linkage is indispensable to preventing the outgrowth and toxin formation of the C. botulinum Type E. It is beside the point that the bacterial infestation here is not one that invades the fish during the processing. A similar point under the earlier Act was met years ago in *United States v. Forty Barrels,* 1916, 241 U.S. 265, 279–281, 36 S.Ct. 573, 60 L.Ed. 995. It was suggested that if, as in the case of Coca Cola syrup, an offending substance was a formulary constituent, it could not be an adulterant because the term "adulterant" connoted additive intrusion. The Court gave that argument short shrift. And a generation or two ago in this Court, Judge Chatfield reached a very similar conclusion in *United States v. Sprague,* E.D.N.Y.1913, 208 F. 419. Oysters packed and shipped in their natural unopened state which were found to harbor bacteria making them unfit for consumption were held to be "adulterated" within the meaning of the Act. The Court said (208 F. at 422)

"The ordinary use of 'adulteration' implies an actual addition to the original substance, through human agency. But the word as used in the section does not restrict this to addition by the hand of man, and if the adulteration of filthy, decomposed, or putrid substance has been added by nature, and is contained in the article to be shipped, it is adulterated in the eyes of the law."

Although the interpretation necessarily contended for by the Government puts a strain upon the language of the statute, it is a now familiar strain dictated by the manifest and dominant purpose of the statute—proscribing manufacturing processes that fail to deal effectively with a known risk of lethal infestation of food. The prescribed processing methods and controls are calculated to eliminate that risk.

■ 2. Defendants argue that Part 128a of 21 C.F.R. is a merely interpretive regulation and is not coercive. The argument really is that Part 128a cannot be a substantive regulation having the effect of law. Defendants point out that the Act does not authorize any such substantive regulations under Section 342, although it does specifically authorize substantive regulations under those sections enumerated in 21 U.S.C. § 371(e)(1). Those regulations are subjected, by Section 371(e) to strict promulgation requirements and broad opportunities for hearings. Section 371(e) also requires that the determination be supported before the Secretary by detailed findings of fact based on substantial evidence of record, which are reviewable in the Court of Appeals rather than the District Court. The contention is that substantive effect may not, in this statutory setting, be ascribed to regulations adopted only under Section 371(a) and brought under judicial control only through 5 U.S.C. § 501 et seq. and § 701 et seq.

Whatever might have been the validity of the argument, it has been settled in this Circuit quite against defendants' contention by *National Nutritional Foods Association v. Weinberger,* 2d Cir. 1975, 512 F.2d 688, 694–698. Since the Food, Drug and Cosmetic Act does not require regulations not

included under Section 371(e) to be made on the record after opportunity for an agency hearing, the rule making procedure invoked by the Commissioner in the present case is that of 5 U.S.C. § 553 and the scope of review is correspondingly that of 5 U.S.C. § 706(2), but without the requirement that the determination to adopt the regulation be supported by substantial evidence.

There might have been debate as to how far the implications of the *Weinberger v. Hynson, Westcott and Gunning, Inc.,* 1973, 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207, group of cases could be extrapolated. Those cases dealt with the new drugs application, approval and withdrawal-of-approval provisions of 21 U.S.C. § 355; those provisions are precisely drawn and deal with an intrinsically factual-adjudicative context in specific applications to definite pharmaceutical substances, and the possibly "interpretive" regulations involved in the *Hynson* group of cases could be thought of as essentially procedural. But the resolution of the issue by Judge Mansfield in *National Nutritional Foods* is surely right, for the procedural regulations involved were what Mr. Justice Black once called "outcome determinative" and not merely procedural regulations.

■ So far as the form and language of Part 128a are concerned, they leave no room whatever for the argument that they were not intended to be "substantive" and coercive if it was lawful for them to have that effect.

3. Defendants argue that any possibility of injury to health from commercially prepared hot-smoked white fish was remote. Hence, defendants argue, there was no reasonable basis for concluding that the time-temperature-salinity prescriptions of Part 128a were necessary or appropriate to prevent the processing methods currently in use from rendering the fish injurious to health.

It appears to be common knowledge in the industry that C. botulinum Type E is ubiquitous and that it occurs in the fresh water lakes from which white fish are drawn. Nearly all of the white fish of the

industry in the greater metropolitan area come from Great Slave Lake and Winnipeg Lake; a small sample of white fish taken from Winnipeg Lake exhibited an 18 to 20% occurrence of C. botulinum Type E spores; a small sample from Great Slave Lake exhibited no spores. It appears also to be common knowledge in the industry that prior to 1963, cases of botulism that were traced to smoked white fish occurred but that there have been no occurrences since 1963. There appears also to be no controversy over the conclusion that vacuum packing of smoked fish, a practice no longer in use, was favorable to the spore development of toxin in smoked fish and was responsible for the 1960 and 1963 botulism outbreaks traced to white fish.

At the hearing in this Court evidence was presented to the effect that the bacteria do not normally occur in the flesh of the fish but rather invade the skin and intestinal tract and migrate to the flesh, apparently in the course of evisceration and other preparation of the fish for brining, smoking and cooking. The same witness testified that since 1899 there had been ten outbreaks of botulism traced to C. botulinum Type E and that the toxin produced by the C. botulinum Type E spore development is a lethal toxin. It is common knowledge that botulism is an acute food poisoning marked by a high rate of mortality. (See, generally Exhibits P, P–1)

The Commissioner's proposal dated October 16, 1969, and published in the Federal Register on October 22, 1969 (34 F.R. 17,-176) was prefaced by the statement that observations in smoked fish processing plants, made since 1963 by the FDA and other regulatory agencies, had shown that the industry had not consistently adhered to manufacturing processes that would minimize the hazard of Type E botulism and the risks of food borne infections in the consumption of smoked fish. It recited further that the Bureau of Commercial Fisheries of the Department of the Interior had suggested that adequate time-temperature-salinity parameters had not yet been established for each individual species smoked

other than chub, and that the Bureau had recommended that the proposed regulations be limited to plant sanitation and should exclude reference to processing techniques dealing with time-temperature relationships, or should describe good manufacturing techniques limited to smoked chub as processed in accordance with the food additive regulation governing the use of sodium nitrite (21 C.F.R. § 121.1230). The prefatory statement continues

"The Food and Drug Administration acknowledges that adequate times, temperatures, and salt concentrations have not been demonstrated for each individual species of fish presently smoked. Much work has been done, however, on the thermal destruction of spores of *Clostridium botulinum* Type E, and to date the processing parameters presented in the proposal are the safest known from the standpoint of preventing outgrowth and toxin formation of *C.botulinum* Type E. It has been established that the public health hazard of *C.botulinum* Type E in smoked fish is not restricted to a single species. Examples of species found to contain spores of *C.botulinum* Type E are lake trout, salmon, black cod (sablefish), sole, sturgeon, and white fish.

"The FDA has been, is, and will continue to be receptive to scientific data that documents adequate processing parameters or offers alternate processing parameters for any individual species of smoked fish. Data must be provided showing that the proposed processing parameters adequately minimize risks of the public health hazard of poisoning by Type E botulism.

"Currently, the situation exists whereby some processors base their manufacturing practices solely on the appearance and acceptability of the finished product quality to consumers rather than on any specific or controlled processing parameters that would minimize the health hazard of *C.botulinum* Type E or its toxins."

Then followed the text of the proposed part 128a.

It is not denied or deniable that the C. botulinum Type E hazard is present and persistent, that the development of toxin occurs, and that it is controllable within acceptable limits by thermal destruction of spores and by maintenance of the fish and the smoked fish product under refrigeration except during the smoking and cooking phase. Nor is it denied or deniable that the Type E toxin is lethal and that botulism poisoning has a high rate of mortality.

It may indeed be the fact that current product sampling of the cooked smoked white fish of defendants and of other producers in the greater metropolitan area did not disclose any evidence of botulinum spores, and that neither defendants nor others in the greater New York area have had any reported cases of botulism poisoning. That overlooks the fact that the regulations were imposed upon an industry already familiar with and using refrigeration and thermal destruction of spores. The cooking and smoking process itself and the brining of the white fish inevitably worked in the direction of Part 128a and its no doubt sterner requirements. The controversy is solely about what time-temperature-salinity parameters are appropriate to give assurance of safety to the consuming public and the fish processors; it is not about the propriety of establishing such parameters.

It is not to be supposed that the 1960, 1963 occurences of botulism in connection with hot-process smoked fish did not of itself cause changes in the industry. One of the communications to the Hearing Clerk in response to the notice of October 16, from the Association of Smoked Fish Processors, Inc., took exception to the FDA comment on industry practices saying

"Since 1963, the processors of smoked fish have made significant changes in their facilities, equipment, utensils, processing practices and controls to improve the sanitation of their manufacturing operations in order to minimize the hazard of Type E botulism and the risks of foodborne infections due to the consumption of smoked fish. The effectiveness of this effort has been demonstrated by the absence of any botulism outbreaks since that time due to smoked fish, and to the minimum incidence of other food-borne infections related to this group of food products."

Defendants by letter to the Hearing Clerk concurred in the Association's general submission but in addition made the point that certain of the proposed requirements were impossible or impractical, specifying that the heating of certain fish types to high temperatures would destroy the product completely and that very cold brining temperatures would not permit the absorption of salt by the fish. As an alternative to the time-temperature procedures defendants suggested that specific processing procedures be established for each species after the completion of adequate work and experimentation.

The owner of a process for imparting smoky flavoring objected to the narrow definition of the term smoked fish and the process requirements but remarked,

"Petitioner notes that the primary function of the new rule was to minimize the 'hazard of Type E botulism and the risks of food-borne infections . . . .' Thus the important limits of the Rule are the paragraphs relating to sanitation, the addition of salt to the product and the application of high temperature for a predetermined time to the fish product."

In its submission to FDA, the Bureau of Commercial Fisheries of the Department of the Interior Fish and Wild Life Service (BCF) favored deferring specific controls until studies were completed with respect to the different species of smoked fish involved. The Bureau's Assistant Director stated

"In our petition for nitrite, we showed that wholesomeness considerations could be more practically and adequately realized by reducing processing temperature and using suitable concentrations of nitrite and salt. Our work also suggests, for example, that if the minimum level of salt (sodium chloride) in the water phase of hot smoked fish is increased, this would allow for a significant reduction in

the processing temperature required which in turn would maintain assurance of consumer safety without elimination of the marketability of most hot smoked fish products. In addition, the use of higher salt levels would lessen the dependency on temperature as a means to inhibit Clostridium botulinum Type E outgrowth, inasmuch as residual salt content can be readily monitored post processing.

"As mentioned above, such an alternative of higher salt concentrations could be used as an interim measure until such time as on-going and future research to define processing parameters for other species are completed. We would be pleased to make specific suggestions to you that will provide on an interim basis a more practical alternative for the various species than the processing conditions specified in the good manufacturing practices."

A detailed suggestion made by BCF was that the 180° 30 minute 3½% salt processing requirement be limited to smoked chub and should present the alternative of processing the chub with salt and nitrite at lower temperature in accordance with 21 C.F.R. § 121.1230.

■ Similarly, neither the detailed response and commentary of the intervenor, National Fisheries Institute, Inc. nor its May 4, 1970 letter (Exhibit C), nor its letter of December 23, 1970 (Exhibit E) in any way suggested that the C. botulinum Type E risk was not real enough to justify adopting a Part 128a in some significant form.

■ 4. The regulation as adopted is adequately supported by the record whether it is viewed as based on the Exhibit D tab A materials only or on all of Exhibit D. The regulation as modified from the original proposal is neither arbitrary nor capricious nor does it represent an abuse of discretion or any other deviation from law. The regulation was not adopted under a section enumerated under 21 U.S.C. § 371(e) but rather under 21 U.S.C. § 371(a). Therefore, it does not come within 5 U.S.C. § 556 or § 557 but rather within 5 U.S.C. § 553(c),

which simply requires that the agency, after considering the relevant matter presented, shall incorporate in the rules adopted a concise general statement of their basis and purpose.

In adopting Part 128a under date of November 2, 1970 (published November 12, 1970, 35 F.R. 17,401) the Commissioner noted that the principal objection to the proposal had been that the process requirements in the proposed regulation could not be applied to all species of fish presently being smoked by the industry and that the regulations should therefore specify time-temperature requirements, as developed by research and study, on a species-by-species basis. The Commissioner then continued

"The Commissioner finds: (1) That although adequate times, temperatures and salt concentrations have not been demonstrated for each individual species of fish presently smoked, the processing requirements of the proposed regulations are the safest now known to prevent the outgrowth and toxin formation of C. botulinum Type E; and (2) that since the public health hazard of C. botulinum Type E in smoked fish is not restricted to a single species of fish, the conditions of current good manufacturing practice for this industry should be established without further delay.

"Therefore, having considered the comments received and other relevant material, the Commissioner concludes that the proposed regulations, with most of the suggested clarifying and technical changes incorporated, should be adopted as set forth below."

As noted above, Part 128a, as originally proposed, would have provided in Section 128a.7(d)(2) that all hot-process smoked fish, after brining to 3.5% salinity, should be heated to 180°F. for a minimum of 30 minutes with the exception of smoked chub containing sodium nitrite as provided for in Section 121.1230 (which had a lower temperature parameter). As adopted, Section 128a.7(d)(2) provided an alternative of either cooking for not less than 30 minutes at 180°F. if the fish was brined to contained

3.5% water phase salt or for 30 minutes at not less than 150°F. if the fish had been brined to contain 5% water phase salt. The alternative for sodium nitrite treated smoked chub was retained.

The Association of Smoked Fish Processors, Inc., had argued that acceptable smoked chubs could not be prepared if the coldest portion of the slowest heating fish in the oven had to retain the temperature of 180° for 30 minutes and had argued that other varieties of fish were even more heat sensitive. The Association added

"Work now underway by the Bureau of Commercial Fisheries on several varieties of fish have indicated very encouraging preliminary results with lower temperature processing in combination with specific salt and nitrite levels."

The Bureau of Commercial Fisheries, as seen in the quotation above, had suggested an alternative of higher salt concentrations as an interim measure until species parameters could be evolved.

The National Fisheries Institute, Inc., the intervenor, speaking for 26 firms actively smoking fish, had pointed out that smoked chub processed at 180° for 30 minutes had proved unacceptable to consumers, and that the matter had been resolved by permitting specified levels of sodium nitrite and chloride together with a lower operating temperature. It was said that if other fish were processed under similar high temperatures, the same marketing problems would arise. Speaking of work being done by the Bureau of Commercial Fisheries on white fish, sable and salmon, the Institute said

"The experimental data indicates (sic) that considerably lower temperatures in combination with specific salt and nitrite levels will result in a smoked fish product that will be acceptable to the consumer, and also adequately minimize the risk of the public health hazard from Type E botulism."

Then the memorandum continued

"In view of the unacceptable time temperature parameter of 180°F. for 30 minutes, we request that the parameter of 150°F. for 30 minutes and 5% salt in the water phase be established as an alternate procedure to that stated in the proposed regulation for an interim period until specific parameters can be established."

Specific language was suggested for Section 128a.7(d)(2) reading as follows

"Hot processed smoked fish shall either contain not less than 3½% salt (sodium chloride) in the water phase throughout the product and shall be heated by a process that will insure a continuous temperature throughout each piece of fish of at least 180°F. for at least ½ hour or shall contain not less than 5% salt in the water phase throughout the product and be heated by a process that will insure a continuous temperature throughout each piece of at least 150°F. for at least ½ hour, except that smoked chub containing sodium nitrite as provided for in 121.1230 of this chapter shall be processed in accordance with that section."

In its letter of May 4, 1970, the Institute did indeed refer to its proposal of the 150°F.–5% salt alternative and to the BCF's suggestion of that as an interim alternative and stated that, "Industry participants at the April 7, 1970 meeting . . . pointed out that recent experimental work showed difficulties in meeting either of the sets of processing parameters." But in the Institute's December 23, 1970, letter (Exhibit E) written in seeking modification of Part 128a, the Institute put it correctly when it said:

"The industry recognizes that all processing requirements contained in FDA's good manufacturing practice regulations must be based on public health considerations. It is also recognized that these requirements cannot be reduced simply because the industry is unable to meet them. Such requirements should, however, be as flexible as possible to afford the industry as many alternative processing parameters as can be justified, based on public health considerations."

The Commissioner's modification of Section 128a(d)(2) to incorporate the 150°–5% alternative met the industry's most clearly

expressed objection. The regulation is certainly not expressly interim in form, as BCF may be thought to have suggested, but regulations are not cut in stone. They are, inevitably, subject to continuous review. There is no indication that at any time before Part 128a was promulgated, specific parameters for different varieties of fish had in fact been developed and presented to the Commissioner as reliable substitutes for the generalized requirement which is complained of in the present case. BCF did not present a petition to amend the food additive (nitrite) regulation respecting smoked chub until March 22, 1971. They then proposed extending the regulation to white fish and adjusting the processing parameters. The petition was incomplete since further studies were still in progress or in contemplation. The petition (FDA No. 1A2671) was still under advisement at January 28, 1972. (Exhibit E)

Other modifications in the proposal were made in response to the industry's suggestions. The suggestion of the owner of the Zestismoke process (imparting smoky flavoring to fish) with respect to smoke flavored fish resulted in the inclusion in Part 128a of provisions embracing smoke-flavored fish, which are treated with salt and given smoke flavor by other than direct smoke action.

The proposed regulation required entirely separate, partitioned space for practically each distinct step in the processing of the smoked fish, and commentators objected that this was impractical and could not be accomplished in the industry's older plants. The objections were acceded to—to the extent of providing that four of the steps "should" be carried out in separate rooms or partitioned spaces and of making the separate room or partitioned space requirement mandatory only as to cooling and packing and storage of the final product. The provision governing inspection of raw fish was also somewhat relaxed. The defrosting requirement was modified. The washing and spraying provisions were altered. The testing provision was relaxed. Finally the provision covering the cooling of the smoked fish after cooking was materially relaxed.

The Commissioner manifestly acted after considering the comments submitted to him, and before final adoption, he materially modified the proposal in accordance with the most important of the objections and suggestions submitted to him. No proceedings were ever instituted to review the regulations as adopted. Furthermore, no later proceeding has been initiated formally and pressed before the Commissioner directly to secure a modification of the regulation. The petition to the Commissioner (see Exhibit E) to extend the chub-nitrite regulation to white fish and, perhaps, other fish has evidently not yet been acted upon by the Commissioner. However, the industry has not elected as it might have under 5 U.S.C. 704, 706(1), to treat non-action in the nitrite matter as an unlawful withholding or unreasonable delay of administrative action which should be corrected by a court. That does not mean that the FDA's failure to act on the later petition furnishes a ground for attacking its adoption of Part 128a; the two matters are distinct in both time and substance. (There were, oddly, overtones throughout the court hearing that the present proceeding was an occasion to review the FDA's allegedly wrongful non-action on the nitrite petition, and that the non-action somehow backlighted the action the FDA had taken in adopting Part 128a.)

On the formal administrative record, therefore, the action of the Commissioner in adopting Part 128a was neither arbitrary nor capricious nor an abuse of discretion nor otherwise unauthorized.

The regulations were authorized by the statute and their enforcement denies no constitutional right to the parties defendant.

5. The defendants argue in substance that, to an indeterminate extent, those responsible for the determination to issue Part 128a in the form in which it was finally issued had resort to some or all of the material contained in defendant's exhibit D under tabs B through L. Apparent-

ly, it is not denied that the Commissioner had proper resort to the material under tab A, the more significant part of which has already been discussed, and which manifestly did effect modifications in the Commissioner's original proposal. Defendants argue that the Commissioner had no right, either directly or through his subordinate personnel, to resort to anything that was not accessible to and notified to those in interest, so that they could meet any material contained in the undisclosed matter that might influence the Commissioner.

It should be said at once that the evidence indicates that the material under tabs B through L was retrospectively gathered from FDA files for any bearing which it could or might have had on the formation of Part 128a. It is not possible to say that the material specifically influenced any particular part of the regulation's language, but the very general and inclusive nature of the material collected indicates that it represents everything that could be located in FDA files germane to the subject matter of the regulation and dated before its issuance.

The basic difficulty with (a) the protestations of defendants and the intervenor that the material under tab A is not adequate to support the regulations and that the issues posed by the responses and comments of the industry were not resolved by determinations of fact and of scientific principle and (b) with the defendants' and intervenor's protestations against the FDA's failure to disclose the materials at tabs B through L for discussion and refutation and (c) with the protestation that there could be no confidence as to which of the material the Commissioner may or may not have relied on—the basic difficulty is that they wholly mistake the occasion and the clear sense of the entire proceeding. The occasion was not one at which any one was disposed to or able to take the position that botulism was nothing to worry about, or that C. botulinum Type E was not ubiquitous in the fresh waters from which the fish were drawn, or that salination and thermal treatment were not basic in the hot-process smoked fish

industry. It is not even deniable that to an indeterminate extent the industry was under loose self-regulation in the same respects covered by Part 128a—that is, in the use of salination and thermal controls. The industry had regulated itself not only to make an edible product but also in the interest of protecting the customers of the processors' customers from the risk of botulism. The post-1963 success of the industry was certainly a cause of self-congratulation. But the Commissioner could hardly be unaware that success begets a relaxation of vigilance, and that inspection reports could not demonstrate industry-wide uniformity of procedures. Nor could the Commissioner guarantee the maintenance of self-imposed processing standards. And while much is said about the supposed want of procedural regularity in offering disclosure and an opportunity to challenge the tabs B through L materials, nothing has been brought forward either during the hearing in the present case nor, so far as counsel has surfaced it, in any other area, to indicate that a total reconsideration of the entire matter within FDA as of November 1970 could have resulted in any different regulation than the one then adopted. This case presents but one issue—in a case where precautionary regulations such as Part 128a (whether self-imposed or imposed by public authority) are admittedly imperative, are those regulations shown to be either arbitrary or capricious or an abuse of discretion? The most that has been claimed is that further modifications in the regulations would be appropriate. And that claim has not been supported by bringing forward evidence to indicate that in November 1970 modifications existed that could have given the assurance of safety required in and assured by Part 128a. The nitrite alternative was not matured and supported; perhaps the chub regulation itself had not had time to settle in.

A survey of the material under tabs B through L discloses nothing which undermines the provisions of Part 128a and it is not material of a kind that could lend itself to contradiction. The material consists almost entirely of neutral investigative stu-

dies apparently conducted with considerable scientific and practical sophistication.

The first part of tab B is composed of four parts—three quarterly reports and a final report of work done in 1963–64 at the University of Wisconsin on C. botulinum Type E. The reports make particular reference to determining the source of the botulinum in smoked fish processed in the Great Lakes area and to the occurrence, persistence and disappearance of toxicity in detected botulinum. These reports were made to FDA under a contract, FDA–63–67. The remaining materials under tab B are quarterly reports and an annual report made to the FDA under contract FDA 64–44 by the University of Wisconsin, Department of Bacteriology. They concern the occurrence of C. botulinum Type E in the Great Lakes. The reports are again completely neutral scientific investigations, chary of conclusion, and they essentially confirm the idea that C. botulinum Type E is more common in some waters than in others. The reports, again, seek to measure the occurrence and persistence of toxicity and to differentiate between occurrences of the botulinum in water, fish and mud. The report also studies differences between botulinum occurrences in enclosed waters and in those waters linked to the Great Lakes themselves.

The papers collected under tab C concern the work of the Bureau of Commercial Fisheries at the Technological Laboratory at Ann Arbor, Michigan relating to smoked fish processing and handling. The 1964 paper is a draft of guidelines, most of which deal with sanitary precautions. The guidelines only concern handling of the fish from the fishing vessel through the plant, and attempt to insure the cleanliness of those procedures. The second paper is a 1967 draft of guidelines which dealt directly with processing of the fish including temperature and salinity requirements, and refrigeration standards. It contains nothing that would suggest modifications in Part 128a. Specifically it assumes the 180°–30 minute–5% parameters (although primarily as applied to chub processing).

Tab D covers a four phase study made in the New York District FDA facility on the methods for hanging fish during the smoking process. The report was generally uncomplimentary to current smoked fish processing and it assumed the desirability of using the 180°–30 minute parameter. On the basis of experimental data derived from the FDA's own processing of several varieties of smoked fish, the report also concluded that a marketable product could be prepared within the 180°–30 minute parameter which would, in the judgment of many, equal the flavor of commercially produced fish but which—in general—would not have as good an appearance. The survey's general conclusion was that with its skills, the industry should be equal to producing marketable fish at the 180°–30 minute parameter. However, the principal emphasis of the study, if not its very purpose, was a solution to the problem of loss of fish from the hooks in the smoking and cooking steps. Some definite recommendations were evolved for reducing this loss.

Tab E covers the summary of a meeting held on July 11, 1968, at the University of Wisconsin. The meeting was intended to review the FDA smoked fish compliance program. It was in general conducted by FDA personnel and was attended by Bureau of Commercial Fisheries representatives, representatives of the Food Research Institute, representatives of the University of Wisconsin, representatives of the National Center for Urban and Industrial Health, representatives of the City of Milwaukee Health Department (which was actually seeking to enforce a 180°–30 minute parameter), a representative of the Michigan Department of Agriculture, Food Inspection Division, the Chief of the Enteric Disease Unit of the National Communicable Disease Center, the Director of the Illinois Department of Health, Division of Food and Drugs, and food inspectors of the Wisconsin Department of Agriculture. The meeting reviewed numerous matters, including reports on the practical administration of various parameters under local laws. The meeting generally assumed as a base line the validity of the 180°–30 minute par-

ameter in combination with a salinity in excess of 3% and refrigeration to 38° or less. However, the Bureau of Commercial Fisheries proposed the following processing parameters: (a) brining the fish so as to achieve a post-process product containing a water phase salt (sodium chloride) content equal to or in excess of 3½% and a sodium nitrite concentration of 200 parts per million, and (b) controlled heat processing so that internal product temperatures equalled or exceeded 160°F. for 30 minutes, and (c) temperature maintenance at or below 38°F. during storage and distribution. The meeting discussed at length whether fish could and would be produced commercially at the 180°–30 minute–3½ or 4% salinity parameters, and, if so, whether the fish would be saleable and whether the parameters could be attained in any large number of the existing processing establishments. There was no suggestion during the meeting that without a second salt such as sodium nitrite it would be safe to process the fish at temperatures lower than 180°. It was suggested that processing at 180° with only sodium chloride salinity might not be as effective as a combination of sodium chloride and nitrite at a lower temperature. The FDA point of view was presented at the meeting and it was noted that a year earlier, the Bureau of Commercial Fisheries had submitted to FDA a summary of research on botulism in smoked chubs which provided information on processing and handling procedures. The summary of meeting then continued—

"The studies sponsored by BCF pointed up that heating fish at 180° for 30 minutes during processing, should bring about destruction of most type E spores, and if brining is accomplished in such a manner as to result in a salt content in excess of 3% in the aqueous phase of the loin muscle, and if the fish are held at 38° or less, the surviving spores will be prevented from growing out in the fish. These 'minimum requirements', along with storage temperatures, sanitation standards and labeling recommendations, were incorporated into 'Good Manufacturing Practice Guidelines', primarily for use by our [FDA] inspectors and Field Districts, but which were disseminated to industry. These Guidelines were reviewed and discussed with the National Fisheries Institute, who voiced intention to pass the recommendations on to their industry. The time-temperature-salt concentration and other recommended procedures have been made known to industry through workshops, seminars and, in many instances, in direct recommendations to plant management during course of inspections."

Tab F covers 72 articles, almost all of which are articles published in specialized periodicals concerning botulism, botulinum Type E and the spores and toxin of Type E. The articles are not only from United States publications but also from journals published in Canada, Japan, Russia, and the Scandinavian countries. The publications stretch back over the years to the 1940s. None of the papers, however, appears to deal with the temperature factor except for one or two papers dealing with the effect of low temperatures (in the freezing range) on toxin development in vacuum packed fish.

Tab G is concerned with reports, for the most part printed and published, on the effect of temperature on C. botulinum Type E toxin formation and the survival and outgrowth of C. botulinum Type E in food products, including smoked fish. Particularly included is the published preliminary report of the Bureau of Commercial Fisheries on the experimental smoking of chub. At the time of that report, in November 1964, BCF was recommending processing at 180° for 30 minutes with 2 to 3% salt in the finished product as being practical in the case of chub. The published papers are for the most part research papers with varying results. However, the results do indicate that Type E botulinum spores, and, in consequence, toxin formation tendencies, did survive at high temperatures, and that temperatures in the order of 176–180° were always in active contemplation. Included at Tab G–5 is a May, 1967 Bureau of Commercial Fisheries paper by Graikoski adhering to the 180°–30 minute–3% salt combina-

tion and indicating that at 140°F. a greater concentration of salt is necessary to inhibit spore outgrowth. Graikoski stated that additional work was needed both to establish more firmly and to extend the general observations, especially in the temperature range from 140 to 180°F. The papers were inconclusive in their consideration of the inhibitory effect of a combination of salt and nitrite, and of the effect of changes in the pH level of the brine and fish.

Tab H contains papers, for the most part printed and published, dealing, essentially from the chemical point of view, with regular salination and the effect of salt additives, including sodium nitrite. The papers also study the effect of changes in pH on spore production and the evolution of toxins. Tab I covers a published and printed 1961 article indicating that the outgrowth and toxin production of spores of C. botulinum Type E varies inversely with temperature in terms of days of incubation and that a critical refrigeration temperature exists in the range of 36 to 40°F.

Tab J embraces 23 papers, most of which were printed and published but some of which were apparently not widely published but, rather, were circulated in typed form. The papers cover a wide variety of botulinum studies. Included were observations of human response to botulinum intrusions and to botulism itself and studies on the temperature sensitivity of the various types of C. botulinum. Broadly, those studies indicated that Type E was more temperature sensitive than Types A and B, particularly in a range in the neighborhood of 176–180°F. The papers also included chemically oriented studies, indicating the significances of various types of salts, including sodium nitrite, and considering the effect of pH in botulinum solutions on outgrowth and toxin production. The papers are not limited to cooked and smoked fish but range more broadly, and include development of botulinum cultures generally. Certain of the papers are so poorly reproduced in the exhibit that, from the legible passages, it is not easy to be confident of the thrust of the papers, but the illegible ones appear to fall

well within the boundaries of the foregoing description. The papers to some extent also consider anti-toxin materials.

The two items included under Tab K relate (a) to the incidence of C. botulinum Type E in smoked fish products (other than white fish) in the Pacific Northwest, and (b) to a means of detecting the presence of C. botulinum Type E. The detection experiment used smoked white fish, chubs and other smoked fish as its base material. Tab L covers a 1970 Bureau of Commercial Fisheries circular entitled "Guidelines for the Processing of Hot-smoked Chub." The Guidelines, dated January 1970, are detailed but are written against the background of acceptance of certain processing parameters. The Guidelines assume the requirement of heating the chubs for 30 minutes at 160°F. with the loin muscle containing a concentration in the water phase of not less than 3.5% sodium chloride and a sodium nitrite concentration between 100 and 200 p.p.m., coupled with cooling of the chubs to 38°F. The parameters of the guidelines are of course those of 21 C.F.R. § 121.1230, first promulgated in August 1969 and amended in March 1970.

The material comprised under Tabs B through L was made available to defendants and presumably to the intervenor during the discovery stages of the case. The expert and the industry evidence introduced at the trial is not at war with anything contained in the Tab B through Tab L material, and, in fact, added nothing of moment to what is in the formal record. Nothing in the B through L material has been or could well be pointed to as determining the Commissioner's conclusion, or as influencing it in such a way that, had it been known to be before him before the determination was made, it could have been met and refuted by other data. The problem did not and does not exist in that perspective or dimension. None of the B through L material suggests, nor do the defendants suggest, that precaution is unnecessary, that C. botulinum Type E is nonexistent, that white fish come from untainted waters, or that there is any possibility

that thermal treatment and salination and refrigeration can be dispensed with without danger to the industry or the public. If anything, the Commissioner's actions in modifying the original proposal demonstrate the openness of the proceeding. The very existence of the smoked-chub regulation (21 C.F.R. § 121.1230) authorizing the use of nitrite and a lower temperature demonstrates not only the industry's acquaintance with temperature-time-salinity parameters, but also shows the Commissioner's willingness to accede to scientific presentations.

■ However, there is no ground for considering the material under Tabs B through L as being in the nature of *ex parte* evidence secretly acted upon to the disadvantage of the class affected by the adoption of Part 128a. In truth, the material contained under Tabs B through L comprises a reference library of the contemporary scientific work being done in the field, and to an extent, internal government views of the matter in the course of evolving a final administrative position. The internal evidence of the interdepartmental exchanges indicates that what the government was thinking about and doing was well known in the industry and to those who were actively interested in the inquiries being pursued as a result of the 1960 and 1963 poisonings, particularly the associations of interested persons. The rest of the material was published material which was either known to or readily accessible to any expert in the field to whom the members of the class to be affected by the regulation would naturally have turned for advice and assistance.

The difference in viewpoint between the Bureau of Commercial Fisheries and the FDA, made perfectly plain in the October 1969 notice, was hardly a secret and was forthrightly dealt with by the FDA. The difference in viewpoint reflects the difference in the roles of the two departments of government, for the FDA had to be concerned not with the hot-process smoked fish processors but with the public safety and the sense of public security in the light of the 1960 and 1963 episodes.

■ 5. Defendants and the intervenor argue that the parameters established by the regulation are impossible of attainment in commercial operations. The evidence introduced at the trial tended to that showing, but it failed to make the showing. It demonstrated only that the processors who testified were unable to meet the parameters without material change in their processing practices. The cross-examination brought out numerous techniques that the industry had not yet exploited, including forced draft heat circulation in the oven, the use of humidifiers, and fresh approaches to the problems of obtaining uniformity of temperature throughout the ovens. There were, further, indications that admittedly expensive modifications in processing procedures might well produce very different results from those obtained with the gas-fired gravity ovens. Such modifications include the use of electronic ovens, currently being introduced in the industry, and further work with control of oven humidity. There was certainly evidence that the electronic furnaces presently in use had not been so used as to meet the parameters and produce a satisfactory product. But the overall impression produced by the evidence was that the effort had not been complete, and that the processors had not attacked the problem with the resolution and industrial ingenuity that would have been summoned if they had acted in the recognition that they would simply have to comply with the parameters of Part 128a if they were to continue operation.

■ The evidence that a marketable product could not be prepared within the parameters suffers from essentially the same defect. The processors who testified were unable to produce marketable fish while staying within the regulation's parameters. But this was only shown to be true under their current processing practices. The taste test, although necessarily a narrow one, was carried out in as fair a manner as the trial situation permitted; if the results were accepted as a fair sampling

of industry experience, they would lead to the conclusion that a product made under the parameters would not be marketable in the greater New York area nor probably in Florida. But that is hardly the issue. There are many other processors who may have mastered techniques that surmount the difficulties presented by the parameters. Moreover, the expectation cannot be that an identical product will be produced if the cooking temperature is materially increased and no compensating modifications, within the parameters, are introduced.

The industry itself had faced the risk that if C. botulinum Type E was not dealt with effectively, its business would be destroyed. If the material under Tabs B through L shows anything, it shows that when Part 128a was proposed in late 1969 it was high time that some such proposal was made, no less in the industry's interest than in the public's interest in personal safety. It was for the industry to devise methods of preserving marketability within the parameters, if, as was inevitable, it was unable to bring forward adequate evidence that some other approach would serve the public interest.

Finally, even if such a proposition could be demonstrated, it is not an answer to the regulation to say that marketable fish could not be processed under it. If that were the case it would simply mean that smoked white fish cannot be regarded as safe and that white fish cannot be processed in their only marketable form without an unacceptable threat to public health. The ultimate fact appears to be that the industry has not been able to come forward with alternative, safe processing means in which it has enough confidence to press them upon the Commissioner, and the industry has not exhausted the search for means of living within the parameters and still preparing marketable smoked white fish.

■ It follows that the United States is entitled to an injunction requiring compliance with the challenged parameters. However, there is much to be said for the defendants' contentions with respect to the other items of non-compliance with the reg-

ulation which were turned up in the course of the inspections. These appear to be rather ordinary deviations from compliance which are readily and once-and-for-all curable by positive action. The evidence indicates that the defendants have taken positive corrective action as to those deviations and, on the basis of the present showing, the final decree need not and should not contain mandatory provisions in those respects. These operational deviations from the regulation do not have the shape of the resolute non-compliance with the time-temperature-salinity parameters which characterizes defendants' conduct of its processing plant up to the time of the second inspection.

6. The defendants' trial evidence was taken over the Government's objection, reserving decision on the question of whether or not the Government was on firm ground in its argument that the regulation was not subject to collateral attack through a *de novo* hearing. Expansion of the scope of the hearing to include evidence addressed to the validity and soundness of Part 128a served the two-fold purpose of being a species of *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 type hearing and of throwing light on the question of whether there was any occasion for an *Overton* type hearing to determine whether or not the Commissioner had acted rationally. If the case is, as the Government contends, controlled by testing Part 128a against the formal record, whether limited to the tab A material or extended to the tabs B to L material, the conclusion must be that Part 128a is fully supported and adequately supported in the formal record. Viewing the whole record, including all the trial evidence, it is concluded (for all the evidence, on review, is seen to exclude the need for any further *Overton* type hearing), that there is no necessity for any further hearing in this Court or for a remand to the Commissioner for reconsideration in the light of matters not before him or not adequately considered by him at the time the regulation was adopted. *Cf. National Nutritional Foods Ass'n v. Weinberger, supra,* 512 F.2d at 703–704. Of course

that is not to say that if the nitrite research has now significantly progressed, the time may not be ripe for a petition to the Commissioner for modification of Part 128a along the lines of the smoked-chub regulation. As noted earlier, such a regulation as Part 128a survives under ambulatory review as the literature in the field opens up new possibilities of analysis of the botulism risk or new means of coping with the spore formation and toxin production of C. botulinum Type E.

7. The Government will draft a decree in accordance with this opinion and either serve it on counsel for the defendants and for the intervenor with ten days notice of settlement, or, preferably, draft it in consultation with the defendants' and intervenor's counsel with a view to agreeing upon a form of decree—in the understanding that agreement on the form of the injunction does not to any extent imply acquiescence in its correctness as a disposition of the case.

It is so ORDERED.