791 F.2d 1016
 NATIONAL BLACK MEDIA COALITION and The New York Affiliate,
National Black Media Coalition, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Association For Broadcast Engineering Standards, Inc. and
National Association Of Broadcasters, Intervenors.
 No. 479, Docket 85-4121.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 17, 1985.
Decided May 27, 1986.
 
 Robert T. Perry, Media Law Clinic, New York Law School, New York City (David E. Honig, Washington, D.C., of counsel), for petitioners.
 David Silberman, F.C.C., Washington, D.C. (Jack D. Smith, Gen. Counsel, FCC, Daniel M. Armstrong, Associate Gen. Counsel, FCC, Douglas H. Ginsburg, Asst. Atty. Gen., John J. Powers III, U.S. Dept. of Justice, Jonathan David, of counsel), for respondents.
 (William J. Potts, Jr., John P. Crigler, Haley, Bader & Potts, Washington, D.C., Henry L. Baumann, Barry D. Umansky, National Ass'n of Broadcasters, Washington, D.C., of counsel), for intervenors.
 Before OAKES, KEARSE and PIERCE, Circuit Judges.
 PIERCE, Circuit Judge:
 
 
 1
 This is a petition to review a report and order of the Federal Communications Commission ("FCC" or "Commission"), released May 7, 1985, concerning frequency allocations on fourteen AM broadcast channels known as AM foreign clear channels. Petitioners National Black Media Coalition and its New York affiliate ("National Black Media") challenge the FCC's departure from its minority preference policy in new rules governing applications for broadcast licenses on these channels. Petitioners claim that the FCC failed to observe proper procedure and that its decision to abandon this non-technical criterion does not rest on a rational basis.
 
 
 2
 We agree with petitioners that the FCC did not give proper notice to interested parties in its Notice of Proposed Rulemaking ("Notice") and, in addition, that it relied on inadequately disclosed data to reach its conclusions. The FCC published a notice in which it announced that it proposed to adopt the minority preference policy, but then it declined to do so in its final report and order without providing a meaningful opportunity for comment as required by Section 4 of the Administrative Procedure Act, 5 U.S.C. Secs. 553(b), (c) (1982). Furthermore, studies and maps relied upon by the FCC in its report and order were not exposed to public comment, so that the Commission cannot be said to have considered all the relevant factors in making its decision. Its order must therefore be overturned as arbitrary and capricious. See United States v. Nova Scotia Food Prods. Corp., 568 F.2d 240, 251-52 (2d Cir.1977).
 
 BACKGROUND
 
 3
 In order to apply for an AM broadcast license, an applicant must demonstrate that its station will operate in compliance with "technical acceptance criteria" designed to prevent interference with other AM stations. See 47 C.F.R. Sec. 73.37(a) (1985). In addition, FCC rules have included five threshold requirements that applications for new AM stations must satisfy. Beginning in 1973, these "non-technical criteria" initially required that an applicant locate its station in an unserved or underserved location. In 1980, the FCC added further non-technical eligibility criteria for the twenty-five AM channels known as the U.S. Class I-A clear channels. As an alternative to establishing a station in an unserved or underserved area, a new applicant could also meet the non-technical criteria for a license if it were a minority-owned enterprise or a non-commercial entity. See Clear Channel Broadcasting in the AM Broadcast Band, 78 F.C.C.2d 1345, 1368-70, reconsid. denied, 83 F.C.C.2d 216 (1980), aff'd sub nom. Loyola University v. FCC, 670 F.2d 1222 (D.C.Cir.1982); 47 C.F.R. Sec. 73.37(e)(2).[1] These "non-technical criteria" are the subject of the present appeal.
 
 
 4
 In the past, international agreements prohibited broadcast stations in the United States from establishing any new nighttime operations on AM foreign clear channels. As a result of an agreement between the United States and Canada and negotiations which are expected to lead to agreements between the United States, Mexico and the Bahamas, restrictions on the number of stations which may operate full-time on the subject fourteen AM stations will be relaxed.
 
 
 5
 In March 1984, the FCC proposed both technical and non-technical rules to govern applications for new full-time service on these channels. See Notice of Proposed Rulemaking, Nighttime Operations on Canadian, Mexican, and Bahamian AM Clear Channels, 49 Fed.Reg. 18567, published May 1, 1984 ("Notice"). In its proposal the FCC stated that, as a result of the short period of time which had elapsed between the 1980 proceeding regarding the twenty-five U.S. Class I-A clear channels and the current proceeding, the resolution of the pertinent issues had remained unchanged. Thus, the Commission proposed to apply the same technical and non-technical eligibility criteria to licensing applications for the foreign clear channels as had been adopted for the twenty-five U.S. Class I-A clear channels. The public interest, the FCC stressed, was best served by continuing to promote the three goals of the 1980 proceeding: "(1) first or second local nighttime radio outlets to unserved or underserved communities; (2) more minority-owned stations; (3) additional noncommercial stations." Noting that the 1980 clear channels proceeding had predicted that only 100 to 125 new stations would result from that proceeding, the Commission concluded that "opportunities to meet these needs still remain inadequate today." The FCC thus proposed to extend the five threshold non-technical eligibility requirements as set forth in 47 C.F.R. Sec. 73.37(e)(2)(i)-(v) to the fourteen AM foreign clear channels. However, the Commission "invite[d] any other proposals that would likely result in the greatest overall benefit to the public," and in its formal invitation to comment, noted that it proposed to adopt the non-technical criteria "substantially as proposed in this Notice of Proposed Rule Making or in accordance with such variants, modifications, or alternatives within the scope of the issues of this proceeding, as we may find preferable after considering the entire record."Thirty-four parties filed comments in response to the Notice. Most of the comments were submitted by daytime-only stations which sought authorization to provide nighttime service on the fourteen AM foreign clear channels. These commentators either suggested adding another threshold standard to the non-technical criteria to permit daytime-only stations to apply for licenses, or waiving the criteria for daytime-only stations, or deleting the criteria altogether. National Black Media applauded the Commission's proposal to continue the non-technical eligibility criteria and noted that the demand for minority-owned stations remained largely unsatisfied.
 
 
 6
 The FCC in a report and order released May 7, 1985, decided not to adopt the non-technical eligibility requirements of Section 73.37(e)(2) after all. The Commission reviewed studies that it had conducted on sample foreign clear channels to determine whether new stations could be established on these frequencies in compliance with FCC interference standards. The studies, it is revealed, showed that "[i]n much of the country, particularly the populous areas, these frequencies could not be used to create new stations, full-time or otherwise, without causing destructive interference to the existing daytime-only and full-time stations on the channel." The agency pointed to maps appended to its report which purportedly showed the limited areas in which new AM stations could be established without causing interference. The Commission concluded that rather than letting these frequencies "lie fallow in major portions of the country," they should be used to enable daytime-only stations to operate at night. Furthermore, it is noted that such a policy would enable daytime-only stations to compete more effectively by removing limits on their broadcasting time. While the FCC admitted that the foregoing does not apply to certain areas of the country, it concluded that because "the areas in which these new stations would be located are concentrated in the unserved or underserved portions of the country, acceptance criteria are not needed to funnel growth toward areas of greatest need. Moreover, these frequencies would continue to be available for minority or public radio applicants." FCC Commissioner Henry M. Rivera dissented, contending that the deletion of the non-technical acceptance criteria lacked a rational basis in the face of underrepresentation of minorities in the broadcast industry.
 
 
 7
 Petitioners challenge the Commission's report and order on several grounds. They contend that the Commission failed to provide interested parties with sufficient notice of the decision to abandon the minority preference policy. Further, petitioners claim that the Commission did not take all relevant factors into account when formulating its new policies and thus its decision must be overturned as arbitrary and capricious. We agree with petitioners that the Commission did not provide the public with notice of its intention to delete the non-technical criteria which includes its minority preference policy; nor did it adequately disclose the studies and maps on which it based its decision.[2] Thus, its decision cannot be said to be grounded on all the relevant factors and it must be reversed as arbitrary and capricious.
 
 DISCUSSION
 
 8
 In order to seek review by this court, petitioners must first survive a challenge brought by the Association for Broadcast Engineering Standards, Inc. and the National Association of Broadcasters as intervenors. These intervenors claim that National Black Media lacks standing to maintain this petition because it is not aggrieved by the Commission's order as required by 28 U.S.C. Sec. 2344 (1982). This argument can be disposed of with dispatch. The membership of National Black Media, a nonprofit organization which seeks to promote access by Blacks to the mass media, is certainly "aggrieved" by an order which departs from a minority preference policy. The Commission's rules regarding AM foreign clear channels are contained in a final agency order that affects the ability of petitioners' membership to obtain broadcast licenses and thus concretely operates "to control the business affairs" of that membership. United States v. Storer Broadcasting Co., 351 U.S. 192, 198-200, 76 S.Ct. 763, 768-769, 100 L.Ed. 1081 (1956). The FCC's withdrawal of the minority preference policy thus adversely affects the members of National Black Media who may contest the notice and rationale of the rulemaking process involved herein.
 
 
 9
 The FCC as respondent raises another challenge to this court's review. The Commission contends that National Black Media should have first raised its claims before the Commission in a petition for reconsideration. While the Commission is correct that normally all issues must have been presented to an agency before judicial review becomes available pursuant to 47 U.S.C. Sec. 405 (Supp.1985), see Western Union Int'l, Inc. v. FCC, 568 F.2d 1012, 1019 (2d Cir.1977), cert. denied, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978); Gross v. FCC, 480 F.2d 1288, 1290-91 n. 5 (2d Cir.1973), this rule is not inflexible and will bend when, in the exercise of judicial discretion, a court determines that the policies underlying this statutory exhaustion requirement are satisfied. Section 405 allows the Commission to consider its own errors or new evidence first, thereby avoiding an usurpation of agency functions and, not incidentally, saving judicial time and resources, see Action for Children's Television v. FCC, 564 F.2d 458, 468-69 (D.C.Cir.1977); Hansen v. FCC, 413 F.2d 374, 376 (D.C.Cir.1969) (quoting Unemployment Compensation Comm. v. Aragon, 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946)). These goals are usually met when, as we discuss below, one of the traditionally recognized exceptions to the exhaustion of administrative remedies requirement is satisfied. See Washington Ass'n for Television and Children v. FCC, 712 F.2d 677, 681-82 (D.C.Cir.1983) (WATCH).
 
 
 10
 When a procedural objection not first raised in a petition for reconsideration essentially alleges a denial of administrative due process and "raises neither a novel factual issue for which an initial Commission determination is quite clearly both necessary and appropriate," nor a legal issue on which the courts have already made known their general views to the contrary, consideration of the merits of the procedural challenge is not appropriate. Action for Children's Television v. FCC, 564 F.2d at 469. The petitioners' argument that the FCC did not give sufficient notice of its decision to abandon the minority preference policy raises neither a novel factual issue that must be considered by the Commission in the first instance, nor a legal issue for which the governing standards have not been previously established. Moreover, it is a judicial, not administrative, function to determine whether sufficient notice has been given, and thus we would not be usurping agency functions to decide this issue without further input from the Commission. Since the goals of Sec. 405 would not be undercut by our consideration of the notice objection notwithstanding the petitioners' failure to raise it before the Commission, we exercise our discretion to do so.
 
 
 11
 In contrast, the claim that the FCC did not adequately disclose the studies and maps on which it based its decision is one on which additional agency input would be useful to the reviewing court, for here the agency could further explain how this information was obtained and the extent to which it was used in developing the rule the agency adopted. Hence, the policies of Sec. 405 would be eroded if the Commission were not given a chance to consider this claim of error. However, "it is not always necessary for a party to raise an issue, so long as the Commission in fact considered the issue." WATCH, 712 F.2d at 682; see Office of Communication of the United Church of Christ v. FCC, 465 F.2d 519, 523 (D.C.Cir.1972) ("On its face, Sec. 405 commands only that the Commission be afforded the opportunity to pass on issues. There is no requirement that this opportunity be afforded in any particular manner, or by any particular party.") (footnote omitted).
 
 
 12
 We conclude that the Commission has already had the required opportunity. In addressing petitions for reconsideration filed by other interested parties in this rulemaking, the Commission apparently has considered National Black Media's objection to the Commission's reliance on previously undisclosed maps and studies in adopting its rule. In a Memorandum Opinion and Order released on February 21, 1986, after oral argument in this case, the Commission noted National Black Media's claim regarding the maps and responded by discussing the significance of the maps and by releasing the draft material from which those maps were derived. The Commission has thus been afforded an opportunity to pass on this issue, and in fact has considered it. We therefore turn to the merits of petitioners' claims.
 
 
 13
 Section 4(b)(3) of the Administrative Procedure Act, 5 U.S.C. Sec. 553(b)(3), provides that:
 
 
 14
 General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include--
 
 
 15
 * * *
 
 
 16
 * * *
 
 
 17
 (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.
 
 
 18
 In addition, the agency must allow interested persons an opportunity to comment on the proposed rules. Id. Sec. 553(c). The adequacy of notice is a critical starting point which affects the integrity of an administrative proceeding. Notice is said not only to improve the quality of rulemaking through exposure of a proposed rule to comment, but also to provide fairness to interested parties and to enhance judicial review by the development of a record through the commentary process. Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 547 (D.C.Cir.1983); Spartan Radiocasting Co. v. FCC, 619 F.2d 314, 321 (4th Cir.1980).
 
 
 19
 While a final rule need not be an exact replica of the rule proposed in the Notice, the final rule must be a "logical outgrowth" of the rule proposed. AFL-CIO v. Donovan, 757 F.2d 330, 338 (D.C.Cir.1985); United Steelworkers v. Marshall, 647 F.2d 1189, 1221 (D.C.Cir.1980), cert. denied sub nom. Lead Industries Ass'n v. Donovan, 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981). Clearly, " 'if the final rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to respond to the proposal.' " AFL-CIO, 757 F.2d at 338 (quoting Small Refiner, 705 F.2d at 547). The test that has been set forth is whether the agency's notice would " 'fairly apprise interested persons of the subjects and issues' [of the rulemaking]." Small Refiner, 705 F.2d at 547 (quoting American Iron & Steel Institute v. EPA, 568 F.2d 284, 293 (3d Cir.1977)).
 
 
 20
 It is clear that here the notice given by the Commission was wholly inadequate to enable interested parties to have the opportunity to provide meaningful and timely comment on the proposal which culminated in the final decision of the agency to delete the non-technical requirements. The Notice clearly stated that the FCC intended to adopt the minority preference policy and other non-technical requirements in the rules for AM foreign clear channels. The FCC even recited the rationale for the proposed rule. Yet, the final rule took a contrary position. See AFL-CIO, 757 F.2d at 338-39 ("A determination of whether notice [is] adequate ... turns, then, on an examination of the notice ... provided in relation to the final rule which was ultimately adopted."). The FCC now attempts to defend its notice by contending that interested parties were invited to submit other proposals and that the Notice stated that the rules governing the use of the fourteen AM channels would be promulgated "substantially as proposed in this Notice of Proposed Rule Making or in accordance with such variants, modifications, or alternatives within the scope of the issues of this proceeding, as [the Commission] may find preferable after considering the entire record." These statements in the Notice can hardly be said to have apprised interested parties of the Commission's intention to abandon the non-technical requirements. If this were enough notification of such intention, an agency could simply propose a rule and state that it might change that rule without alerting any of the affected parties to the scope of the contemplated change, or its potential impact and rationale, or any other alternatives under consideration. As one court has pointed out: "[u]nfairness results unless persons are 'sufficiently alerted to likely alternatives' so that they know whether their interests are 'at stake.' In cases where an administrative agency has failed to give the public advance notice of the scope of its proceedings, courts have invalidated the decisions made." Spartan Radiocasting, 619 F.2d at 321 (quoting South Terminal Corp. v. EPA, 504 F.2d 646, 659 (1st Cir.1974) and citing cases).
 
 
 21
 Furthermore, the comments of other interested parties do not satisfy an agency's obligation to provide notice. In AFL-CIO, 757 F.2d 330, the court held that notice was insufficient when a final rule differed significantly from the proposed rule. In that case, it appeared that the change was prompted by a suggestion contained in one of the comments. The court noted that the Notice signaled no contemplated change from the proposed rule and found the comments inadequate to supply notice:
 
 
 22
 Neither can we properly attribute notice to the other appellants on the basis of an assumption that they would have monitored the submission of comments. "As a general rule, [an agency] must itself provide notice of a regulatory proposal. Having failed to do so, it cannot bootstrap notice from a comment. The [Administrative Procedure Act] does not require comments to be entered on a public docket. Thus, notice necessarily must come--if at all--from the agency."
 
 
 23
 Id. at 340 (quoting Small Refiner, 705 F.2d at 549 (emphasis in original)). The cases cited by respondent in this regard are inapposite. See, e.g., WJG Telephone Co. v. FCC, 675 F.2d 386, 389 (D.C.Cir.1982) (final rule implicit in FCC's notice); Ethyl Corp. v. EPA, 541 F.2d 1, 48-49 & n. 100 (D.C.Cir.) (en banc) (three comment periods; reproposed regulations clearly indicated alternative under consideration), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976); California Citizens Band Ass'n v. United States, 375 F.2d 43, 48-49 (9th Cir.) (modification did not have real impact), cert. denied, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967).
 
 
 24
 Further, the FCC's conclusions were, by its own admission in its report and order, based on maps which were appended to that order and internal studies. These maps and studies were not disclosed throughout the proceeding and thus parties had no opportunity to comment on their methodology or conclusions. It is clear that " '[i]t is not consonant with the purpose of a rulemaking proceeding to promulgate rules on the basis of inadequate data or on data that, [in] critical degree is known only to the agency.' " Nova Scotia Food Prods., 568 F.2d at 251 (quoting Portland Cement Ass'n v. Ruckelshaus, 486 F.2d 375, 393 (D.C.Cir.1973), cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974) (emphasis added in Nova Scotia Food Prods.)). The FCC contends that these studies were based on public data and were largely corroborated by the comments; however, it is "the methodology used" in creating the maps and studies, and "the meaning to be inferred" from them, id. at 251, that should have been a part of the public record. This non-disclosure thus prevented petitioners and perhaps others from making relevant comments. For example, petitioners contend that the FCC's studies themselves support a finding that, contrary to the Commission's conclusions, a significant number of licenses could be granted to applicants from currently served areas without creating interference. The agency, therefore, cannot be said to have taken into account all relevant factors in reaching its decision. "In this circuit we have said that 'it is "arbitrary or capricious" for an agency not to take into account all relevant factors in making its determination.' " Id. (quoting Hanly v. Mitchell, 460 F.2d 640, 648 (2d Cir.), cert. denied, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972)). A reviewing court is obligated to set aside a final agency action if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or made "without observance of procedure required by law." 5 U.S.C. Sec. 706(2)(A), (D).
 
 
 25
 We hold that, in failing to provide notice of its decision to abandon its minority preference policy, the FCC did not comply with the notice provision of the Administrative Procedure Act. Furthermore, the Commission's action must be set aside because it used critical, yet unpublished, data to reach its conclusions and likely did not take all the relevant factors into account in the rulemaking proceeding. We therefore grant the petition for review and remand to the Commission for proceedings not inconsistent with this opinion.
 
 
 
 [1]
 47 C.F.R. Sec. 73.37(e)(2) states:
 (2) Application for a new unlimited-time station or for nighttime facilities by an authorized daytime station or for a major change in facilities resulting in operation on one of the 25 Class I channels listed in Sec. 73.25(a) by any authorized station:
 (i) That at least 25 percent of the area or population which would receive interference-free primary service at night from the proposed station does not receive such service from an authorized AM broadcast station or service from an authorized FM broadcast station with a signal strength of 1 mV/m, or greater, or,
 (ii) That the proposed station would provide the community designated in the application with a first or second authorized nighttime aural transmission service, and that no FM channel is available for use in that community, or,
 (iii) That at least 20 percent of the area or population of the community designated in the application receives fewer than two aural services at night from authorized stations, and that no FM channel is available for use in that community, or,
 (iv) That minority persons hold over 50% of the ownership interests in the applicant for a Class II-B or Class II-C station on one of the 25 Class I channels listed in Sec. 73.25(a), or;
 (v) That the applicant proposes to operate a Class II-B or Class II-C station noncommercially on one of the 25 Class I channels listed in Sec. 73.25(a).
 
 
 [2]
 We decline to reach petitioners' claim that there is inadequate evidence to support the FCC's abandonment of the minority preference policy. See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285-86, 95 S.Ct. 438, 441-42, 42 L.Ed.2d 447 (1974). Since notice and the opportunity to comment were insufficient, the substance of the FCC's conclusions need not be examined at this review